## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JASON HARLOFF, Derivatively on Behalf of Nominal Defendant WARNER BROS. DISCOVERY INC., | C.A. No. |
| Plaintiff, | <u>**JURY TRIAL DEMANDED**</u> |
| v. | |
| DAVID ZASLAV, GUNNAR WIEDENFELS, LI HASLETT CHEN, RICHARD W. FISHER, PAUL A. GOULD, KENNETH W. LOWE, JOHN C. MALONE, FAZAL MERCHANT, PAULA A. PRICE, SAMUEL A. DI PIAZZA, DEBRA L. LEE, and GEOFFREY Y. YANG, | |
| Defendants, | |
| and | |
| WARNER BROS. DISCOVERY, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

By and through his undersigned counsel, Plaintiff Jason Harloff ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Warner Bros. Discovery, Inc. ("WBD" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duty; (iii) unjust enrichment; (iv) abuse of control; and (v) gross mismanagement. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without

limitation: (a) review and analysis of public filings made by WBD and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on WBD's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Collura v. Warner Bros. Discovery, Inc., et al.*, Case No. 1:24-cv-09027 (S.D.N.Y.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning WBD and the Defendants.

## NATURE OF THE ACTION

1.      Plaintiff brings this action derivatively for the benefit of Nominal Defendant WBD against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately February 23, 2024 to the present (the "Relevant Period").[1]

2.      WBD is a worldwide media and entertainment company offering a diverse range of content, brands, and franchises across television, film, streaming, and gaming platforms. The company operates through multiple reportable segments, including, among others, its Networks segment, which primarily encompasses its domestic and international television networks.

3.      WBD's television networks include, among others, TNT, which has used basketball programming to boost ratings and revenue since 1988, especially through its U.S.

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately February 23, 2024 to August 7, 2024; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

sports rights agreements with the National Basketball Association ("NBA"). As part of its existing 2014 agreement with the NBA, TNT paid an average annual fee of $1.2 billion.

4.     In 2024, the NBA began advanced talks with its partners for a new set of media-rights agreements expected to last about ten years. WBD was unable to finalize a new deal with the NBA before its exclusive negotiation period ended in April 2024, opening the door for the NBA to engage with other companies for its sports rights. Among those, NBC proposed an average annual fee of $2.5 billion, while Amazon offered an average annual fee of $1.8 billion.

5.     Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly re-evaluate its business and goodwill; (ii) WBD's goodwill in its Networks segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) the foregoing significantly increased the likelihood of WBD incurring billions of dollars in goodwill impairment charges; (iv) accordingly, Defendants had overstated WBD's overall business and financial prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.     On August 7, 2024, WBD issued a press release announcing its second quarter 2024 financial results. Among other items, WBD reported disappointing revenue of $9.71 billion, representing a 6.3% year-over-year ("Y/Y") decrease and missing consensus estimates by $360 million; as well as a net loss of approximately ***$10 billion*** because of a $9.1 billion non-

cash goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects. WBD disclosed that the goodwill impairment charge was "triggered in response to the difference between market capitalization and book value, continued softness in the U.S. linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA."

7.     On this news, WBD's stock price fell $0.69 per share, or 8.95%, to close at $7.02 per share on August 8, 2024.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff has suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

11.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this this District, and Defendants have received substantial compensation within this district by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## PARTIES

**A.     Plaintiff**

12. Plaintiff was a shareholder prior to the start of the Relevant Period, is currently, and has continuously been, a holder of WBD common stock.

**B.     Nominal Defendant**

13. Nominal Defendant WBD is incorporated in Delaware and its current principal executive offices are located at 230 Park Avenue South, New York, New York 10003. The Company's common stock trades on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "WBD."

**C.     Defendants**

14. Defendant David M. Zaslav ("Zaslav") is the Company's Chief Executive Officer ("CEO") and President. Defendant Zaslav is also a member of the Company's Board of Directors (the "Board"). Defendant Zaslav is named as a defendant in the Related Securities Action.

15. Defendant Gunnar Wiedenfels ("Wiedenfels") is the Company's Chief Financial Officer ("CFO"). Defendant Wiedenfels is named as a defendant in the Related Securities Action.

16. Defendants Zaslav and Wiedenfels are hereinafter referred to as the "Securities Action Defendants."

17. Defendant Samuel A. Di Piazza ("Di Piazza") has been the Chair of the Board of Directors since 2022. Defendant Di Piazza is a member of the Board's Audit Committee.

18. Defendant Richard W. Fisher ("Fisher") has been a member of the Board since 2022. Defendant Fisher is a member of the Board's Compensation Committee and Nominating and Corporate Governance Committee.

19.    Defendant Paul A. Gould ("Gould") has been a member of the Board since 2008. Defendant Gould is the Chair of the Board's Compensation Committee and is a member of the Nominating and Corporate Governance Committee.

20.    Defendant Debra L. Lee ("Lee") has been a member of the Board since 2022. Defendant Lee is a member of the Board's Compensation Committee.

21.    Defendant Kenneth W. Lowe ("Lowe") has been a member of the Board since 2023. Defendant Lowe is a member of the Board's Audit Committee and Compensation Committee.

22.    Defendant John C. Malone ("Malone") has been a member of the Board since 2008. Defendant Malone the Chair of the Board's Nominating and Corporate Governance Committee.

23.    Defendant Fazal Merchant ("Merchant") has been a member of the Board since 2022. Defendant Merchant is a member of the Board's Audit Committee and the Nominating and Governance Committee.

24.    Defendant Paula A. Price ("Price") has been a member of the Board since 2022. Defendant Price is the Chair of the Board's Audit Committee.

25.    Defendant Geoffrey Y. Yang ("Yang") has been a member of the Board since 2022. Defendant Yang is a member of the Board's Compensation Committee.

26.    Defendant Li Haslett Chen ("Chen") was a member of the Board from 2022 until stepping down effective January 31, 2025.

27.    Defendants Zaslav, Di Piazza, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, Chen, and Yang are collectively referred to herein as the "Director Defendants."

28.    The Director Defendants, along with the Securities Action Defendants, are collectively referred to herein as the "Individual Defendants."

29.    The Individual Defendants, along with WBD are collectively referred to herein as the "Defendants".

### D.    Related Party Non-Defendants

30.    Related Party Non-Defendant Joey Levin ("Levin") has been a member of the Company's Board since 2025. Levin is named solely for the purpose of demand futility.

31.    Related Party Non-Defendant Anthony Noto ("Noto") has been a member of the Company's Board since 2025. Noto is named solely for the purpose of demand futility.

32.    Related Party Daniel E. Sanchez ("Sanchez") has been a member of the Company's Board since October 2024. Sanchez is named solely for the purpose of demand futility.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.    By reason of their positions as officers, directors, and/or fiduciaries of WBD, and because of their ability to control the business and corporate affairs of WBD, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage WBD in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of WBD and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34.    Each director and officer of the Company owes to WBD and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

35.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

## Duties of the Members of the Audit Committee

36.     Pursuant to the Audit Committee Charter of WBD (as of August, 2022),[2] the purpose of the Audit Committee is to "provide assistance to the Board in fulfilling the Board's responsibilities to the Company and its stockholders relating to the accounting, financial reporting process, internal controls and the audit of the Company's financial statements."

37.     Concerning the Company's Financial Statements and Disclosures, Internal Controls, and Risk Oversight the Audit Committee Charter sets forth the following responsibilities:

*Financial Statement and Disclosure Matters*

<u>Audited Financial Statements</u>. The Committee shall review and discuss with management and the independent auditor the Company's annual audited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's review of the annual audited financial statements, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

<u>Interim Financial Statements</u>. The Committee shall review and discuss with management and the independent auditor the Company's quarterly financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of

---

[2] Available at https://s201.q4cdn.com/336605034/files/doc_downloads/governance_guidlines/2022/08/FINAL-AUDIT-COMMITTEE-CHARTER-8.pdf.

the Company's Forms 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

<u>Review of Financial Disclosures</u>. The Committee shall review and discuss with management and the independent auditor, as applicable, (A) significant issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements; (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; (D) any other financial disclosures prior to their inclusion in the Company's Form 10-K or Forms 10-Q to determine that management and the independent auditor are satisfied with the disclosure and content of the financial statements to be presented; and (E) earnings press releases prior to their public release, including the use of non-GAAP financial measures, as well as financial information and earnings guidance (generally or on a case-by-case basis) provided to analysts and rating agencies.

*       *       *

*Controls and Procedures*

<u>Risk Management</u>. The Committee shall discuss with management the Company's significant business risk exposures including those related to (i) financial reporting and accounting risk, (ii) legal and regulatory risk, (iii) cybersecurity and information technology risk, and (iv) the steps management has taken to monitor and control such risk exposures, including the Company's risk assessment and risk management policies or guidelines. As appropriate, the Committee shall review such matters with the Board.

*       *       *

*Oversight of the Company's Internal Audit Function*

<u>Oversight</u>. The Committee shall oversee the activities, organizational structure, and qualifications of the internal audit function and review the appointment and replacement of the senior internal audit executive. The internal audit function shall report functionally to the Committee and administratively to the Company's Chief Financial Officer.

Internal Audit Process. In connection with its oversight of the Company's internal audit process, the Committee shall:

- Discuss with the independent auditor and management the internal auditor function's responsibilities, budget and staffing and any recommendations or suggested changes in the planned scope of the internal audit function.

- Review and approve the annual internal audit plan, objectives, and schedules and review any special projects undertaken by the internal audit function.

- Advise the director of the internal audit department that he or she is expected to provide the Committee summaries of and, as appropriate, the significant reports to management prepared by the internal audit department and management's responses thereto.

38.     Regarding Compliance Oversight, the Charter states:

Code of Ethics. The Committee shall periodically review the Company's Code of Ethics (the "Code"), reassess its adequacy and recommend any proposed changes to the Board for approval.

Procedures for Complaints. The Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or audit matters, (ii) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters, (iii) ) the review of any reports of the independent auditor mandated by Section 10A of the Exchange Act and the obtainment from the independent auditor of any information with respect to illegal acts in accordance with Section 10A; (iv) the review, discussion and treatment of any reports concerning material violations submitted by Company attorneys or outside counsel; and (v) the review and oversight of compliance with, and the establishment of procedures for, the treatment of alleged violations of the Code, waivers of provisions of the Code and reporting and disclosure of such violations and waivers.

39.     Under information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Company's Code of Ethics**

40.     The Individual Defendants, as officers and/or directors of WBD, were also bound by the Company's Code of Ethics (the "Code")[3] which, according to the Code, sets out basic principles to guide all directors, officers, and employees of WBD, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

41.     Regarding the basic purpose of the Code, the Code states that:

INTEGRITY MATTERS.
When we conduct business ethically, we send a message to our consumers, business partners, shareholders and other stakeholders that they can put their trust in us. By doing the right thing, we not only protect our reputation, but we also help Warner Bros. Discovery, Inc. ("Warner Bros. Discovery" or "the Company") thrive.

To that end, we have created this Code of Ethics ("Code"). It provides standards for: ensuring compliance with applicable laws, regulations and Company policies; promoting integrity and the highest standards of ethical conduct; and helping us avoid even the appearance of anything improper in our business activities.

42.     Regarding compliance with laws, rules, and regulations, the Code states:

Complying with the law is the minimum standard for ethical conduct and we are committed to full compliance with all laws and regulations that apply to our business. It is, however, impossible to anticipate every situation that might arise in the course of your day-to-day business activities. Therefore, the Code includes additional resources that are available to you as questions arise. As an employee, it is up to you to use good judgment and to seek help when necessary. If any provision of the Code conflicts with a local law or requirement, you should seek guidance from your People & Culture partner or the Ethics & Compliance Office.

43.     Regarding the integrity of financial records and public disclosure, the Code states:

Our financial records serve as a basis for managing our business and fulfilling our responsibilities to shareholders, our employees and other stakeholders. The integrity of our financial records is also important to our compliance with accounting, tax and public disclosure laws and regulations and other requirements.

---

[3] Available at https://s201.q4cdn.com/336605034/files/doc_downloads/2023/02/wbd_code-of-ethics_us_english_main-version.pdf.

We are committed to maintaining accurate and complete financial records and to full, fair, accurate, timely and understandable disclosure in reports and documents that are filed with the U.S. Securities and Exchange Commission and other regulatory bodies or are otherwise made publicly available.

Individually, we are all responsible for recording clear, accurate and honest information in all Company records that we produce, such as expense reports, financial statements and public disclosure documents.

If you have any concerns about questionable accounting or audit matters, you should immediately contact the Ethics & Compliance Office or Internal Audit. You may submit your concerns anonymously where permitted by law. It is essential for the Company to learn about possible accounting or audit concerns so we can investigate them promptly. When in doubt, speak up. The Company does not tolerate any acts of retaliation for good faith reports of accounting or audit concerns.

**Examples of questionable accounting/audit matters include:**

- Fraud or deliberate error in the preparation or audit of any financial statement or record.

- Deficiencies or noncompliance with the Company's internal accounting controls.

- Misrepresentations or false statements contained in Company's financial or audit records or reports.

- Other deviation from full and fair reporting of the Company's financial condition.

44.     Regarding communications with the public, the Code states:

We are committed to maintaining honest, professional and lawful internal and public communications and recognize the need for a consistent voice when issuing statements about the Company or providing information to the public. For this reason, it is important that only authorized persons speak on behalf of Warner Bros. Discovery. Communications with media, investors, stock analysts and other members of the financial community should be referred to Corporate Communications and/or Investor Relations.

**Full, Fair and Timely Disclosures**

As a public company, we are committed to meeting our obligations of full, fair and timely disclosure in all reports and documents that describe our business and financial results, and other public communications.

45.    Regarding reporting concerns, the Code states:

An issue cannot be addressed unless it is brought to someone's attention. It is therefore incumbent upon each of us to seek guidance when "the right thing to do" is unclear and to report legal or ethical concerns when they arise.

Your manager is a good starting point for any questions or concerns you might have about the Code or other Company policies. However, if you're uncomfortable speaking with your manager for any reason, you should:

- Contact another member of management (and it does not have to be someone in your direct line of reporting);

- Contact your People & Culture partner;

- Contact the Ethics & Compliance Office; and/or

- Call the ethics hotline (the "Hotline") toll-free at 800-398-6395 or access the Hotline website (wbd.ethicspoint.com). The Hotline website lists toll-free numbers for all locations in which the Company has offices. Anonymous reports will be accepted where permitted by law.

The Company will make every reasonable attempt to ensure that your concerns are addressed appropriately. Reports from employees outside the U.S. may be subject to the laws of the country in which the employee works. The Company will handle all reports, including anonymous reports, in accordance with local privacy regulations and other applicable laws.

46.    Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

## **Control, Access, and Authority**

47.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of WBD, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by WBD.

48. Because of their advisory, executive, managerial, and directorial positions with WBD, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of WBD.

49. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of WBD and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

50. To discharge their duties, the officers and directors of WBD were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of WBD were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how WBD conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable

inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that WBD was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

51.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to WBD and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of WBD, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of WBD, the absence of good faith on their part, and a reckless disregard for their duties to WBD and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to WBD.

52.     The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

53.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, WBD has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

56.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

57.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

59.    WBD is a global media and entertainment company that provides a portfolio of content, brands, and franchises across television, film, streaming, and gaming outlets. The Company operates through three reportable segments: Studios, Networks, and Direct-to-Consumer ("DTC"). The Networks segment primarily consists of its domestic and international television networks.

60.    WBD's television networks include, *inter alia*, TNT, which has relied on basketball programming to drive ratings and revenue since 1988, particularly through its U.S. sports rights agreements with the NBA. Under its existing 2014 deal with the NBA, TNT paid an annual average fee of $1.2 billion.

61.    In 2024, the NBA entered advanced discussions with its various partners for a new round of media-rights deals that would last approximately a decade.

### Materially False and Misleading Statements Issued During the Relevant Period

62.    The Relevant Period begins on February 23, 2024, when WBD issued a press release during pre-market hours announcing its fourth quarter and full year 2023 financial results (the "4Q/FY23 Earnings Release"). The 4Q/FY23 Earnings Release quoted Defendant Zaslav as stating, in relevant part, that Defendants had purportedly "execut[ed] against [their] strategic plan to reposition the company," were "now on solid footing with a clear pathway to growth," and "ha[d] an attack plan for 2024 that includes . . . further progress against [their] long-range

financial goals" such that Defendants "[we]re confident in [their] ability to drive sustained operating momentum and enhanced shareholder value."

63.     With respect to WBD's Networks segment, the 4Q/FY23 Earnings Release stated, *inter alia*:

- Networks operating expenses decreased 7% ex-FX[4] to $2,829 million compared to the prior year quarter. The AT&T SportsNet business exit favorably impacted the year- over-year growth rate by approximately 300 bps[.]
- Costs of revenues decreased 7% ex-FX, primarily driven by lower international sports rights fees, including the transfer of TNT Sports Chile, exiting the AT&T SportsNet business, as well as lower domestic general entertainment content expense, partially offset by the impact of inflation in Argentina.
- SG&A [selling, general, and administrative] expenses decreased 4% ex-FX, primarily driven by lower personnel expenses.

64.     The same day, WBD hosted a conference call with investors and analysts to discuss the Company's fourth quarter and full year 2023 results (the "4Q/FY23 Earnings Call"). During his prepared remarks on the 4Q/FY23 Earnings Call, Defendant Zaslav asserted, *inter alia*, that "[o]ur top priority this year was to get this company on solid footing and on a pathway to growth, and we've done that;" that "[w]e've significantly enhanced the efficiency of the organization with a long runway still to go;" that "[w]e are optimistic that the efforts we've undertaken on digital and advanced advertising solutions . . . will enable us to achieve a more competitive profile;" and that, "[b]ottom line, we're a far healthier company now," "we're building real momentum," "[a]nd we expect 2024 will be a year to drive that momentum forward even further" notwithstanding "the impacts of ongoing disruption in the pay-TV ecosystem and a dislocated linear advertising ecosystem."

---

[4] WBD's references to "ex-FX" in its financial statements refer to the exclusion foreign exchange rate effects.

65.    With respect to the NBA and its content, Defendant Zaslav stated, in relevant part:

> Last weekend we saw great coverage and strong ratings at the NBA All-Star Game and All-Star Weekend. We have a strong positive 40-year relationship with the NBA. And in terms of our NBA rights, we are now fully engaged in renewal discussions, and they are constructive and productive. Our global sports portfolio continues to provide real meaningful value to all of our platforms. We're proud to be the home of one of the most coveted collections of premium sports content in the industry, along with a best-in-class talent roster and exceptional production values.

66.    During the question-and-answer ("Q&A") phase of the 4Q/FY23 Earnings Call, an analyst noted that it was "great news to hear [the positive news regarding] the NBA conversations," which "[c]learly . . . would be a big positive to retain those rights," and asked "[h]ow do you think about making that work financially for the company" given "that linear TV is under pressure on the revenue side, and I think it's probably safe to say the NBA costs are going to go up," and "how do you guys approach this from a kind of a P&L [profit and loss] point of view when you think about exploiting the NBA for what I imagine will be another long-term deal?" Defendant Wiedenfels responded, in relevant part:

> [O]n the NBA, as you know, we're in the middle of exclusive discussions here, so I want to lift it up maybe one level to a general statement on how we look at sports rights. We're spending close to $20 billion sort of, on content and programming in the broadest sense, and every dollar we spend plays a different role across the portfolio. We generally like to own our content. That's not the case with sports, but we obviously acknowledge the enormous value, reach value, emotional value of these deals. And we have been able to strike profitable deals and we're always going to be disciplined. It's very easy to lose control over sports rights investments. That's not what we do. We're going -- we know exactly what value we assign and we stay disciplined during our discussions.

> And if you take that into account, I think we have enormous opportunity to be much more efficient with our content spend overall across the entire company, and that will include certain areas in which, you're right, you probably have to assume that there is inflation going forward. On the NBA specifically, we've had a very, very strong partnership for 40 years, and I certainly hope that we're going to be able to continue that in the most positive way.

67.    Also on February 23, 2024, WBD filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K"). With respect to the Company's 2023 goodwill impairment analysis, the 2023 10-K stated, in relevant part:

*2023 Impairment Analysis*

As of October 1, 2023, the Company performed a quantitative goodwill impairment assessment for all reporting units. The estimated fair value of each reporting unit exceeded its carrying value and, therefore, no impairment was recorded . . . . [T]he Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%. The fair values of the reporting units were determined using a combination of DCF [discounted cash flow] and market valuation methodologies. Due to [*inter alia*] declining levels of global GDP growth, [and] soft advertising markets in the U.S. associated with the Company's Networks reporting unit . . . the Company will continue to monitor its reporting units for changes that could impact recoverability.

68.    In addition, the 2023 10-K contained generic, boilerplate representations regarding WBD's "invest[ment of] significant resources to acquire and maintain licenses to produce sports programming" and that "there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed," stating, in relevant part:

We face significant competition to acquire and maintain licenses to sports programming, which leads to significant expenditure of funds and resources. As a result of an increasing number of market entrants in the programming space, we have seen upward pressure on programming costs in recent years, particularly in connection with the licensing and acquisition of sports content from third parties. We may also be impacted by such upward pressures driven by increasing investment in programming by competitors . . . . There can be no assurance that we will be able to compete successfully in the future against existing or new competitors to obtain and/or maintain licenses to recurring sports events, or that increasing competition for programming licenses . . . will not have a material adverse effect on our business, financial condition or results of operations.

There can also be no assurance that we will recoup our investment in sports programming, including realizing any anticipated benefits of our joint ventures.

> The impact of these contracts on our results of operations over the term of the contracts depends on a number of factors, including the strength of advertising markets and subscription levels and rates for programming. Our success with sports programming is highly dependent on consumer acceptance of this content and the size of our viewing audience.

The foregoing risk warning was a generic, catch-all provision that was not tailored to WBD's actual known risks regarding its sports rights negotiations with the NBA, much less that these negotiations were causing, or were likely to cause, the Company to significantly re-evaluate its business and goodwill.

69.    The 2023 10-K also contained generic, boilerplate representations regarding WBD's potential future "recogni[ition of] . . . impairment charges related to goodwill and other intangible assets," while simultaneously downplaying the likelihood of the same, stating, in relevant part:

> We have a significant amount of goodwill and other intangible assets on our consolidated balance sheet. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired. Significant negative industry or economic trends, including the continued decline of traditional linear television viewership and linear ad[vertising] revenues, disruptions to our business, inability to effectively integrate acquired businesses, underperformance of our content, unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and market capitalization declines ***may*** impair goodwill and other intangible assets. Any charges relating to such impairments ***could*** materially adversely affect our results of operations in the periods recognized.

(Emphases added.) This risk warning, too, was a generic, catch-all provision that was not tailored to WBD's actual known risks regarding impairments to its Networks segment's goodwill, much less that the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA, were likely to lead to billions of dollars in goodwill impairment charges.

70.     Appended as exhibits to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

71.     On April 19, 2024, WBD filed its 2024 Proxy Statement, the 2024 Proxy Statement was solicited by Defendants Zaslav, Di Piazza, Lee, Yang, Chen, Fisher, Gould, Lowe, Malone, Merchant, and Price. The 2024 Proxy Statement solicited shareholder to approve, among others: (i) election of the eight director nominees named herein for a one-year term; (ii) ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2024; and (iii) advisory resolution to approve the 2023 compensation for named executive officers.

72.     Concerning the Board's role in risk oversight, the 2024 Proxy Statement stated:

The Board has overall responsibility for overseeing risk management at WBD and has delegated functional oversight for certain risks to each of the three standing Board committees, as highlighted in the chart below. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed about such risks through committee reports and other presentations. Senior management is responsible for developing and implementing the Company's financial and strategic plans and identifying, evaluating, managing, and mitigating the risks inherent in those plans. Our Board is responsible for overseeing those plans, the associated risks, and the steps that senior management is taking to manage and mitigate risks.

During 2023, in order to assess key risks, challenges and opportunities, we developed a customized enterprise risk management program, which considers financial, operational, regulatory, reputational, extended enterprise, strategic,

technological and talent risks. The Audit Committee oversees the enterprise risk management program. Our Chief Audit and Risk Officer primarily leads the development and assessment of enterprise risk management processes and policies, including identifying, assessing, and reporting on risks. Our Chief Audit and Risk Officer and other members of our senior management provide updates to the Audit Committee on the enterprise risk management program.

**Board of Directors**

- has an active role, as a whole and at the committee level, in overseeing risk management.
- regularly discusses with senior management the Company's competitive positioning, long term strategic plans and key priorities.

| Audit Committee | Compensation Committee | Nominating and Corporate Governance Committee |
| --- | --- | --- |
| • financial reporting<br>• internal controls<br>• cybersecurity and information technology<br>• data privacy<br>• ESG disclosures<br>• compliance and ethics | • incentive compensation plans<br>• CEO and other executive officer compensation<br>• other employee benefit and compensation arrangements | • corporate governance<br>• Board composition, independence and potential conflicts of interest<br>• ESG initiatives and strategies<br>• director succession planning |

73.    However, Defendants failed to disclose that: (i) the sports rights negotiation with the NBA were causing or were likely to cause Warner to face a substantial re-evaluation of business and goodwill; (ii) the Company's goodwill in its Networks segment had deteriorated as a result of the difference in market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty in regards to its sports rights renewals (most notably, the NBA). Due to this, Defendants overstated the Company's financial health and business prospects, thus causing the 2024 Proxy statement to be materially false and misleading.

74.    Furthermore, the 2024 Proxy Statement was also false and misleading as it failed to disclose that the Company did not in fact maintain proper internal controls as it pertained to risk management.

75.    On April 22, 2024, WBD's exclusive sports rights negotiating window with the NBA expired without a deal, allowing the NBA to negotiate with other companies for its sports rights content, including, *inter alia*, NBC, which offered to pay an annual average fee of $2.5 billion, and Amazon, which offered to pay an annual average fee of $1.8 billion.

76.    On May 9, 2024, WBD issued a press release announcing its first quarter 2024 financial results (the "1Q24 Earnings Release"). The 1Q24 Earnings Release quoted Defendant Zaslav as stating, in relevant part, that "[w]e are pleased with our progress in the first quarter as evidenced by strong results in important [key performance indicators]" and that "[w]e continue to make bold moves to transform our company for the future as we position ourselves to take full advantage of the opportunities ahead."

77.    With respect to WBD's Networks segment, the 1Q24 Earnings Release stated, *inter alia*:

- Networks operating expenses decreased 8% ex-FX to $3,006 million compared to the prior year quarter. The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps[.]
  - Costs of revenues decreased 8% ex-FX, primarily driven by the AT&T SportsNet exit, the allocation of U.S. sports costs to DTC, as well as lower general entertainment content expense. These benefits were partially offset by the timing of domestic sports rights expense, unfavorable inflationary impacts in Argentina, and higher election expenses. The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps.
  - SG&A decreased 8% ex-FX, primarily driven by lower overhead expenses.

78.    The same day, WBD hosted a conference call with investors and analysts to discuss the Company's first quarter 2024 results (the "1Q24 Earnings Call"). During his prepared

remarks on the 1Q24 Earnings Call, Defendant Zaslav repeatedly touted Defendants' purported "confiden[ce]" in their assets, stating that "we're very confident in the strength of our assets and believe we will see both strategic and financial progress in the quarters ahead;" and that "we're more confident than ever in our assets and our playbook."

79.     With respect to WBD's negotiations with the NBA, Defendant Zaslav stated, in relevant part:

> We've enjoyed a strong partnership with the NBA for almost four decades. We're in continuing conversations with them now, and we're hopeful that we'll be able to reach an agreement that makes sense for both sides.
>
> We've had a lot of time to prepare for this negotiation, and we have strategies in place for the various potential outcomes. However, now is not the time to discuss any of this. Since we are in active negotiations with the league and under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them. With that in mind, please understand that this is as much as we're prepared to say about this topic today.

80.     Defendant Wiedenfels, during his prepared remarks on the 1Q24 Earnings Call, highlighted that WBD "continued [to] benefit from [*inter alia*] the [Company's] many initiatives to improve working capital, which we are still in the early innings of realizing," a "more disciplined and analytical approach to content investment and allocation," and "meaningfully lower cash restructuring costs."

81.     With respect to advertising trends, Defendant Wiedenfels stated, in relevant part, that "we did see sequential improvement [in] linear [markets] . . . in the first quarter" and "[t]otal company advertising in Q1 was down 7%, a sequential improvement of 300 basis points," as well as asserted that Defendants "expect another record quarter in Q2," which, "in part, reflects an increasingly more holistic portfolio approach to monetizing viewership on [*inter alia*] linear .

. ., supporting our ability to offer our partners incremental reach and more customized ad[vertising] solutions spanning all platforms, particularly in the US."

82.     During the Q&A phase of the 1Q24 Earnings Call, in response to an analyst's inquiries regarding WBD's "restructuring while navigating through the massive industry changes" and, "from a WBD point of view, what do you think the biggest surprises will be," as well as whether Defendants "can . . . give us your outlook for both sides, both [DTC] and linear," Defendant Zaslav stated, in relevant part:

> [F]or us, it's really two tiers. One is we got rid of a lot of content we didn't think was going to help us. But at the same time, we brought in a lot of great creatives and invested a lot of content. So, it's, how do we run these businesses efficiently for real free cash flow and drive for growth? But two, creative excellence. How do we have the best content?
>
> In this past year, HBO had maybe its best year ever, and in addition to that, Warner Brothers Television has some of the best, highest quality TV production, and we're looking at our motion picture business now, which we're feeling really good about. It's number one to start the year, but we have a lot of great content. So, I think it's that combination.
>
> Great content, great creatives, fighting to tell the best stories on every platform, and then running it like a real business. Real free cash flow and real EBIT [earnings before interest and taxes], and I think those two will drive us for the future.

83.     In response to these same inquiries, Defendant Wiedenfels stated, in relevant part:

> I would . . . say that we're operating in a much more constructive environment this year than we did last year. So hopefully, that'll be supportive.
>
> To your point . . . about the differentiation between D2C and linear, well really one of the things that's working very well right now is that convergence. The way . . . the team take our inventory to the market is fully harmonized now. It's across platforms, incremental reach. We're leaning in further.
>
> *     *     *
>
> Longer term, there is definitely more opportunity here. We have been very transparent about the significant monetization difference between linear and digital advertising. [Defendant Zaslav] talked about AI a couple of minutes ago.

Certainly that should be a helper longer term as we think about our go-to-market here, so definitely some upside.

*     *     *

We're seeing how we're running the company fundamentally differently that's not reflected in our current and near-term financials, and I think that's going to be the surprises.

84.     Also on May 9, 2024, WBD filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2024 (the "1Q24 10-Q"). With respect to the Company's goodwill and intangible assets impairment analysis for the quarter, the 1Q24 10-Q stated, in relevant part:

> During the three months ended March 31, 2024, the Company performed goodwill and intangible assets impairment monitoring procedures for all of its reporting units and identified no indicators of impairment or triggering events. As of October 1, 2023 . . . the Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%. The Company will continue to monitor its reporting units for triggers that could impact recoverability of goodwill. These triggers include, but are not limited to, continued decline in the Company's market capitalization; affiliate and sports rights renewals, including the NBA, associated with the Company's Networks and DTC reporting units; [and] declining levels of global GDP growth and soft advertising markets in the U.S. associated with the Company's Networks reporting unit[.]

85.     In addition, the 1Q24 10-Q contained substantively the same boilerplate risk warnings as referenced above, *supra*, regarding WBD's "invest[ment of] significant resources to acquire and maintain licenses to produce sports programming" and that "there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed," while acknowledging that "our license for NBA programming is currently subject to renewal, and our exclusivity period with the NBA has expired" and, "[a]s a result, we face increased competition to license content from the NBA, which ***could*** result in significantly higher programming costs to us or a failure to maintain our license for NBA programming." (Emphasis added.) This risk

warning was a generic, catch-all provision that was not tailored to WBD's actual known risk that its negotiations with the NBA were causing, or were likely to cause, the Company to significantly re-evaluate its business and goodwill.

86.     Likewise, the 1Q24 10-Q continued to provide boilerplate risk warnings regarding WBD's potential future "recogni[ition of] . . . impairment charges related to goodwill and other intangible assets," while simultaneously downplaying the same, stating, in relevant part:

> We have a significant amount of goodwill and other intangible assets on our consolidated balance sheets. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired . . . . The occurrence of certain events or circumstances *could* result in a downward revision in the estimated fair value of a reporting unit or intangible assets. For example, continued negative industry or economic trends, including the decline of traditional linear television viewership and linear ad[vertising] revenues, declining levels of global GDP growth and soft advertising markets in the U.S., disruptions to our business, inability to effectively integrate acquired businesses, execution risk associated with anticipated growth in our DTC products, underperformance of our content, failure to renew content licenses and distribution agreements, including affiliate and sports rights renewals (including the NBA), unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and continued decline in our market capitalization *could* negatively affect our estimates of the fair value of our reporting units. When events or changes in circumstances such as this occur, we have needed to, and *may* in the future need to, write-down the value of our goodwill and other intangible assets. *If* we determine that our estimate of the fair value of a reporting unit is below the recorded value of that unit on our balance sheet, we *may* record a non-cash impairment loss for the goodwill. Any charges relating to the impairment of our goodwill and other intangible assets *could* materially adversely affect our results of operations in the periods recognized.

> We consider all current information when determining the need for, or calculating, any impairment loss. However, future changes in events or circumstances, such as a continuation or worsening of the current negative industry and economic trends and the other events and circumstances described above, *could* result in decreases in the fair value of our goodwill and other intangible assets and require us to record additional impairment losses that *could* materially adversely affect our results of operations in the periods recognized.

(Emphases added.) This risk warning, too, was a generic, catch-all provision that was not tailored to WBD's actual known risks regarding impairments to its Networks segment's goodwill, much less that the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA, had significantly deteriorated the Networks segment's goodwill to such an extent that the Company was likely to record billions of dollars in goodwill impairment charges in a matter of months.

87.     Appended as exhibits to the 1Q24 10-Q were substantively the same SOX certifications as referenced above, *supra*, signed by the Individual Defendants.

88.     The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly re-evaluate its business and goodwill; (ii) WBD's goodwill in its Networks segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) the foregoing significantly increased the likelihood of WBD incurring billions of dollars in goodwill impairment charges; (iv) accordingly, Defendants had overstated WBD's overall business and financial prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

89.    In addition, throughout the Relevant Period, WBD's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required WBD to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." Defendants' failures to disclose, *inter alia*, that WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly re-evaluate its business and goodwill, as well as that WBD's goodwill in its Networks segment had significantly deteriorated to such an extent that the Company was likely to record billions of dollars in goodwill impairment charges, violated Item 105 because this issue represented a material factor that made an investment in the Company speculative or risky.

90.    For similar reasons, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Sage to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failures to disclose, *inter alia*, that WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly re-evaluate its business and goodwill, as well as that WBD's goodwill in its Networks segment had significantly deteriorated to such an extent that the Company was likely to record billions of dollars in goodwill impairment charges, violated Item 303 because this issue represented a known trend or uncertainty that was likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Emerges**

91.    On August 7, 2024, during after-market hours, WBD issued a press release announcing its second quarter 2024 financial results (the "2Q24 Earnings Release"). Among other items, WBD reported disappointing revenue of $9.71 billion, representing a 6.3% Y/Y decrease and missing consensus estimates by $360 million; as well as a net loss of approximately **$10 billion** resulting from a $9.1 billion non-cash goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects. With respect to WBD's reported net loss during the quarter, the 2Q24 Earnings Release stated, in relevant part:

> Net loss available to [WBD] was $(10.0) billion, which includes a $9.1 billion non- cash goodwill impairment charge from the Networks segment, as well as $2.1 billion of pre-tax acquisition-related amortization of intangibles, content fair value step-up, and restructuring expenses.
>
> - The goodwill impairment was triggered in response to the difference between market capitalization and book value, continued softness in the U.S linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA.

92.    That same day, during after-market hours, WBD hosted a conference call with investors and analysts to discuss the Company's second quarter 2024 results (the "2Q24 Earnings Call"). On the 2Q24 Earnings Call, Defendant Wiedenfels stated, in relevant part:

> Little more color on the Goodwill impairment. And to get straight to the point here, there is no one factor that is driving this impairment. So the way this works is obviously with the amount of goodwill that we have, there's a systematic process that we go through every quarter and we're monitoring for so-called triggering events.
>
> ***And this is clearly where a sports right discussion like the one with the NBA comes into play as a triggering event, which then compels us to re-evaluate our business case*** in a strategic planning process with the latest assumptions, the best view of where the industry is and how we play in that field. ***And that's what then leads to evaluation, which in the second quarter happened to be $9.1 billion below what was on the books for the network segment.*** So it's really a full re-evaluation, not a response to one individual factor.

(Emphases added.)

93.    Following the 2Q24 Earnings Release and the 2Q24 Earnings Call, WBD's stock price fell $0.69 per share, or 8.95%, to close at $7.02 per share on August 8, 2024.

94.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff has suffered significant losses and damages.

## DAMAGES TO THE COMPANY

95.    WBD has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, WBD has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

   a.  costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

   b.  substantial loss of market capital;

   c.  costs already incurred and to be incurred defending the Related Securities Action; and

   d.  any fines or other liability resulting from the Company's violations of federal law.

96.    In addition, WBD's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

97.    The wrongdoing complained of herein has irreparably damaged WBD's corporate image and goodwill.  For at least the foreseeable future, WBD will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in

illegal behavior and have misled the investing public, such that WBD's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

98.     Plaintiff brings this action derivatively in the right and for the benefit of WBD to redress injuries suffered, and to be suffered, by WBD as a direct result of violations of federal securities laws by the Defendants.  WBD is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99.     The Board of WBD, at the time this action was commenced, consisted of Defendants Zaslav, Di Piazza, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, and Yang (collectively the "Demand Defendants"), and Related Party Non-Defendants Levin, Noto, and Sanchez, a total of thirteen (13) individuals.

100.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the WBD Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

101.    Each of the Demand Defendants was responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Demand Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

102.    Upon information and belief, in their capacity as members of the Company's Board, the Demand Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

### Demand is Futile as to Defendant Zaslav Because His Principal Professional Occupation as the Company's CEO and President

103.    Defendant Zaslav serves as the President and CEO, he assumed these positions after the April 2022 merger of WarnerMedia and Discovery of WBD. Defendant Zaslav is also a member of the Board.  The Company's website notes that Defendant Zaslav "sets the strategy and oversees all operations for Warner Bros. Discovery's global suite of brands, including Warner Bros. Pictures and Warner Bros. Television Group, HBO and Max, discovery+, CNN, TNT Sports, HGTV, Food Network, OWN, ID, Warner Bros animation, Discovery Kids, Eurosport and more". As such, it is reasonable to infer that due to the importance of the Company's business and goodwill in its Networks segment Defendant Zaslav would have been aware of its deterioration resulting from the uncertainty related to its sports rights renewals as well as the difference in market capitalization and book value.

104.    Further, the Company does not claim that Defendant Zaslav is an independent director and because his primary source of income and primary employment is his employment as President and CEO of WBD and his professional reputation is inextricably bound to his role at WBD Defendant Zaslav is incapable of acting independently and demand is futile upon him.

105.    Lastly, as noted in the 2024 Proxy Statement, Defendant Zaslav's daughter was employed by the Company as a producer for CNN. Thus, Defendant Zaslav could not take action against the Individual Defendants which could, in turn, adversely impact his daughter and her livelihood.

**Demand is Futile as to Audit Committee Defendants**

106.     Demand is futile as to Defendants Di Piazza, Lowe, Merchant, and Price (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill her responsibilities.

107.     The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties of the Audit Committee are set forth herein, *supra.*

108.     Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

109.     The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the deterioration of the Company's business and goodwill specifically in relation to WBD's negotiations with the NBA and the likelihood that this would result in substantial goodwill impairment charges.  In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to Defendants Di Piazza, Fisher, Lee, Yang, Gould, and Malone**

110.    Demand is futile as to Defendants Di Piazza, Fisher, Lee, Yang, Gould, and Malone, as they lack independence due to, among others, their strong personal and business relationships between them.

111.    For instance, Defendant Di Piazza was a member of the board of directors of AT&T, Inc. ("AT&T") from 2015 to 2022. Defendant Fisher served as a member of the AT&T board of directors from 2015 to 2021. Defendant Lee served as a member of the AT&T board of directors from 2019 to 2022. Defendant Yang served as a member of the AT&T board of directors from 2016 to 2022. Defendants Di Piazza's, Fisher's, Lee's, and Yang's time on the board of AT&T was overlapping, creating a strong personal and business relationship between and among them. As such, they could not exercise independent business judgment in considering a demand to investigate and prosecute this action.

112.    Defendant Lee further lacks independence, as the Company hired her daughter as a writer for a TV program produced by Warner Bros. Television in 2023. Thus, Defendant Lee is conflicted and could not reasonably consider a demand which could have an impact on her daughter and her livelihood.

113.    Defendant Gould has been a member of the board of directors of Liberty Latin America, Ltd. ("Liberty LATAM") since 2017 and as a member of the board of directors of Liberty Global Ltd. ("Liberty Global") since 2005. Defendant Gould also was a member of the board of directors of Discovery Holding Company ("Discovery Holding") from 2005 to 2008, when it merged with Discovery.

114.    Defendant Malone was a member of the board of directors of Liberty LATAM from 2017 to 2019 and of Liberty Global since 2005. Defendant Malone also was the CEO and Chairman of the Board of Discovery Holding from 2005 to 2008, when it merged with

Discovery. As a result of Defendants Gould's and Malone's longstanding personal and business relationship, they cannot exercise independent business judgment in considering a demand to investigate and prosecute this action.

### Demand is Futile as to the Demand Defendants

115.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

116.    Upon information and belief, in their capacity as members of the Company's Board, the Demand Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

117.    Each of the Demand Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Demand Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

118.    Accordingly, the Demand Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

119.    Plaintiff incorporated by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

121.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

122.    Under the direction and watch of the Individual Defendants, the 2024 Proxy Statement failed to disclose to the investors that: (i) WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly re-evaluate its business and goodwill; (ii) the Company's goodwill in its Networks segment had significantly deteriorated as a result in the difference between its market capitalization and book value, softness in certain U.S. advertising markets and uncertainty related to the sports rights renewals; (iii) as a result of the foregoing, the financial strength of the Company was less appealing than

claimed; (iv) accordingly, WBD's commercial and financial prospects were overstated; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times. Furthermore, the 2024 Proxy Statement falsely represented that the board was conducting appropriate risk oversight.

123.    The 2024 Statement was also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the Company's core business, operations and prospects in relation to the conduct alleged herein.

124.    The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the re-election of the Company's directors.

125.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omission in the 2024 Statement.

126.    Plaintiff, on behalf of WBD has no adequate remedy at law.

## COUNT II

**Against the Securities Action Defendants**
**for Contribution Under Section 10(b) of the Exchange Act,**
**Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    As a result of the conduct and events alleged above, WBD has been named as a

defendant in the Related Securities Action brought on behalf of WBD shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

129.    Federal law provides WBD with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, WBD has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling WBD to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

130.    Accordingly, Plaintiff, on behalf of WBD, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with WBD under Rule 10b-5, or if joined in such actions, would be liable for the same damage as WBD.

131.    WBD claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding Securities Action Defendants**

132.    Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased WBD securities during the Relevant Period.

133.    The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing WBD securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

134.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

135.    The Plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

136.    When the Securities Action Defendants signed off on or made the false and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of WBD, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

137.    Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if WBD were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of WBD.

**Allegations Regarding the Securities Action Defendants as Control Persons**

138.     In acting as alleged above, the Securities Action Defendants were acting as authorized agents of WBD in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were, able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

139.     The Securities Action Defendants were "controlling persons" of WBD within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

140.     Plaintiff hereby derivatively claims such right of contribution on behalf of WBD.

## COUNT III

### Against the Individual Defendants for Breaches of Fiduciary Duty

141.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.     The Individual Defendants owed and owe WBD fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe WBD the highest obligation of good faith, loyalty, and due care.

143.     The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to WBD shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

144.   During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused WBD to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to WBD and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

145.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146.   Plaintiff, on behalf of WBD, has no adequate remedy at law.

## COUNT IV

### Against all the Individual Defendants for Unjust Enrichment

147.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of WBD.

149.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to WBD.

150.   Plaintiff, as a shareholder and representative of WBD, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

151.   Plaintiff, on behalf of WBD, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Abuse of Control

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of WBD and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

154.    As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

155.    Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

## COUNT VI

### Against the Individual Defendants for Gross Mismanagement

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.    The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company.  Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

158.    Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders

in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

159.    By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of WBD's affairs and in the use and preservation of WBD's assets.

160.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused WBD to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to WBD, thus breaching their duties to the Company.

161.    As a result, the Individual Defendants grossly mismanaged WBD and should be liable to the Company for the resulting damages

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of WBD and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to WBD the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing WBD and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect WBD and its shareholders from a repeat of the damaging

events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

      (1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

      (2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      D.     Determining and awarding to WBD exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

      E.     Awarding WBD restitution from Defendants, and each of them;

      F.     Awarding WBD Contribution from the Securities Action Defendants, and each of them;

      G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      H.     Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 20, 2025

Respectfully submitted,

_/s/ Ryan M. Ernst_

**BIELLI & KLAUDER, LLC**
Ryan M. Ernst, Esq. (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Main: (302) 803-4600
Direct: (302) 321-5411
rernst@bk-legal.com

_Attorneys for Plaintiffs_

**LIFSHITZ LAW PLLC**
Joshua M. Lifshitz
1190 Broadway
Hewlett, NY 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
jlifshitz@lifshitzlaw.com